UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

| | |
|---|---|
| Eddie Markeith Frazier, | Case No. 22-CV-2532 (JWB/JFD) |
| Plaintiff, | **DEFENDANT'S TRIAL BRIEF** |
| vs. | |
| Scott David Mueller, | |
| Defendant. | |

_____

Pursuant to the Court's Trial Notice and Final Pretrial Order (ECF No. 74), Defendant Scott Mueller respectfully submits this Trial Brief.

## I.   AGREED FACTS/DISPUTED FACTS

The parties have filed a Stipulation Regarding Trial Facts. The key facts in this case are disputed, including most significantly whether the force that Deputy Mueller used was reasonably necessary to prevent a threat of death or serious injury to him or others.

## II.   TRIAL COUNSEL

The following attorneys[1] will represent Deputy Mueller at trial:

   Jeff Timmerman (Atty. Reg. No. 0352561)
   Michael Goodwin (Atty. Reg. No. 0390244)
   Office of the Minnesota Attorney General
   445 Minnesota Street, Suite 1400
   St. Paul, MN 55101-2131
   (651) 583-7660 (Timmerman Direct)
   (651) 757-1456 (Goodwin Direct)
   jeffrey.timmerman@ag.state.mn.us
   michael.goodwin@ag.state.mn.us

---

[1] Our paralegal, Linda Sterling, will provide invaluable logistical support at trial.

1

### III. JURY/NON-JURY

Deputy Mueller has no preference as to whether this case is tried to a jury or to the Court, but Frazier has demanded a jury trial.

### IV. LENGTH OF TRIAL

We estimate the trial will last five days.

### V. CLAIMS OR DEFENSES

Frazier will try one cause of action, under 42 U.S.C. § 1983. He claims Deputy Mueller used excessive force against him, in violation of his rights under the Fourth Amendment to the United States Constitution.

Deputy Mueller will try his affirmative defenses that: (1) the forced he used on Frazier was reasonably necessary to prevent a threat of death or serious injury to Deputy Mueller or others; and (2) Deputy Mueller is entitled to qualified immunity as a matter of law. As to qualified immunity, Deputy Mueller's proposed Special Verdict Form contains special interrogatories that will enable the jury to make requisite factual findings the Court may rely upon to make a qualified immunity ruling.

### VI. JURISDICTION

Frazier brings one cause of action, under 42 U.S.C. § 1983. The Court has federal-question jurisdiction over that claim. 28 U.S.C. § 1331.

## VII. FACTS

Eddie Frazier murdered his fiancée, Tawnja Wallace, before sunrise on May 3, 2017, in Crookston, Minnesota. Then he packed a bag, grabbed his belongings—including a gram of crack cocaine and more than a dozen baggies of marijuana packaged for individual sale—and fled to the Twin Cities in a loaner vehicle. While enroute, Frazier used Ms. Wallace's EBT card to withdraw cash from her account, stopped for alcohol, picked up Ms. Wallace's car in Detroit Lakes, and switched vehicles. He also spoke to Ms. Wallace's family members and confessed to causing her death.

The Minnesota Bureau of Criminal Apprehension (BCA) was called in to assist the homicide investigation, including locating and arresting Frazier. Throughout the day, the BCA learned critical information about Frazier, including details of the murder, that he had admitted responsibility, and his extensive criminal history—which includes more than 20 felony convictions, some for crimes of violence and fleeing law enforcement.

Much of this information was communicated to Deputy Mueller, who at the time oversaw the BCA's Metro Regional Office. Deputy Mueller has worked in law enforcement since 1998 and today is the BCA's Deputy Superintendent of Investigations. Before this promotion, Deputy Mueller led the BCA's Force Investigative Unit, which investigates officer use-of-force incidents across Minnesota. During his decorated career, Deputy Mueller has taught use-of-force training to hundreds of law enforcement personnel.

The BCA's immediate objective was to find Frazier. BCA agents, including Special Agents Michael Kaneko and Lance Lehman, were tasked with geolocating Frazier's cell phone. It pinged in Robbinsdale, and then North Minneapolis, but law enforcement did not

find him at either location. Hours later, Frazier's cell phone was tracked to a SuperAmerica convenience store in Bloomington. Deputy Mueller, who had gone home for the day when Fraizer's cell phone went dark, left his son's baseball game to rejoin the search.

BCA Senior Special Agent Chris Olson went to the SuperAmerica but Frazier was gone. Special Agent Olson spoke with a SuperAmerica clerk who recognized Frazier and reported that Frazier had attempted to steal a screwdriver from the store. The clerk relayed that Frazier appeared to be under the influence and had acted erratically. When the clerk confronted Frazier, he paid for the screwdriver and displayed multiple baggies of what the clerk believed to be drugs. Special Agent Olson conveyed this information to Deputy Mueller, who was also told that Frazier had been involved in the narcotics trade.

Frazier used the screwdriver to switch out the license plates on Ms. Wallace's car with license plates he stole from other vehicles. He knew by this point that law enforcement was searching for him. Based on the constellation of information Deputy Mueller received, he concluded that Frazier had a propensity for violence and suspected that Frazier might be armed.

The BCA ultimately tracked Frazier's cell phone to the 8600 block of Oakland Avenue South, a quiet residential street in Bloomington. Oakland Avenue runs north-to-south and in May 2017, this particular segment of the road intersected with 86th Street to the north and dead-ended to the south. The data placed Frazier's cell phone in a vehicle parked in the driveway of a residence near where the street dead-ended.

Special Agents Kaneko and Lehman arrived at the scene in an unmarked BCA surveillance van, confirmed the cell phone's presence, and parked on the west side of

Oakland Avenue, facing south. Frazier subsequently backed out of the driveway without activating his headlights and parked his vehicle on the east side of Oakland Avenue, facing north, south of the surveillance van's position. Once Frazier parked, Agent Lehman observed him dangling his feet out of the front driver's side door and slumping over.

Deputy Mueller arrived at the scene in an unmarked Dodge Charger at approximately 9:00 p.m. to assist with surveillance. He slowly drove past Frazier, positively identified Frazier as the suspect in Ms. Wallace's murder, and likewise observed Frazier slumping out of Frazier's parked car—which Deputy Mueller knew from his training and experience suggested Frazier may be impaired. Deputy Mueller also learned that Frazier had been spotted driving up curbs. Frazier was indeed legally intoxicated, with a blood alcohol of at least .10.

After passing Frazier's vehicle, Deputy Mueller continued south on Oakland Avenue, turned his car around at the dead end, and parked on the east side of the street, pointing north, about a dozen car lengths behind Frazier's vehicle. The plan was to keep tabs on Frazier until marked Bloomington Police Department squads arrived to arrest him. In the event Frazier fled, it was safer to the public for marked squads to pursue him than the unmarked BCA vehicles onsite.

That plan changed when Frazier began driving northbound before Bloomington police arrived. Deputy Mueller followed Frazier but kept his distance. The agents anticipated Frazier would either proceed north on Oakland Avenue across 86th Street, or turn left or right onto 86th Street (a major thoroughfare).

5

Frazier did neither. Upon broaching the 86th Street intersection, he made a hard left turn and pulled into the driveway of the last home on the west side of Oakland Avenue before its intersection with 86th Street, while staring down the agents. Frazier's maneuver struck Deputy Mueller as strange and Special Agent Kaneko, who likewise believed Frazier may be armed, perceived that Frazier intended to provoke a confrontation.

Frazier then backed out of the driveway and pointed his car south, directly at the agents. While Frazier was reversing, Deputy Mueller drove forward, stopping parallel to Special Agent Kaneko and Lehman's surveillance van. Deputy Mueller activated his vehicle's emergency lights, grabbed his service rifle, and exited his car. Only two car lengths separate Frazier and the agents.

Special Agents Kaneko and Lehman exited the van and drew their service weapons. The agents identified themselves as law enforcement and shouted commands at Frazier—whose front car windows were rolled down—ordering Frazier to surrender. Frazier ignored the agents' commands. He had a thousand-yard stare. The agents believed they were in trouble.

***What happened next is at the heart of this case. And it lasted just seconds.***

Frazier accelerated toward the agents. Each believed that Frazier's car was going to hit him and feared for his safety. Deputy Mueller heard Frazier's engine rev. With only a few feet now separating Frazier's car and the agents, Deputy Mueller moved his focus to his rifle's red-dot sight, significantly narrowing his field of vision. Through the sight, Deputy Mueller observed Frazier—whose left hand remained on the car's steering wheel—raising his right arm in a manner that Deputy Mueller perceived, based on his training and

6

experience, indicated that Frazier was about to present a firearm. Deputy Mueller knew that if Frazier had a gun and he waited to see Frazier's hand, it would be too late.

Perceiving that Frazier was about to run the agents over and was also raising a firearm, Deputy Mueller fired one round from his rifle. He aimed center mass, at Frazier's chest. It is the only time Deputy Mueller has fired a round in the line of duty. To Deputy Mueller, things felt like they were moving in slow motion. It seemed like the trigger took too long to pull and the shot sounded muffled, as though it came from blocks away.

Unperceived by Deputy Mueller, Frazier's car began to turn in the same moment as, or right after, Deputy Mueller made the decision to fire. The bullet entered the open right passenger side window of Frazier's car and grazed his right arm. A fraction of a second after making the decision to fire, Deputy Mueller heard the squeal of tires and felt a whoosh as Frazier's car buzzed him, turning around and fleeing northbound on Oakland Avenue. Perceiving that the immediate threat of injury or death had now abated, Deputy Mueller put down his rifle, got back into his car, and pursued Frazier.

Deputy Mueller and Special Agents Kaneko and Lehman did not have identical perceptions of their encounter with Frazier, nor do their recollections of the encounter perfectly match. It would be concerning if they did. The science of psychophysiology explains why differences in perception and recall are the norm, and how Frazier's car could have begun turning after Deputy Mueller made the decision to shoot but before he pulled the trigger.

After an hours-long search, officers found Frazier in a backyard shed. He was transported to Hennepin County Medical Center and treated for an open radial shaft

7

fracture, which required surgical repair and physical therapy. Frazier was later convicted of murdering Ms. Wallace.

## VIII. UNRESOLVED ISSUES

Nine motions in limine are pending, five filed by Frazier and four by Deputy Mueller. (ECF Nos. 78, 80, 82, 85, 93, 95, 97, 99, 101.) Deputy Mueller does not oppose Frazier's motions in limine regarding collateral source evidence or the scope of Dr. Kris Mohandie's expert testimony (ECF Nos. 97 and 99), and takes no position on Frazier's request for attorney-conducted voir dire (ECF No. 101).

Frazier's remaining two motions in limine (ECF Nos. 93 and 95) are disputed. Deputy Mueller must be allowed to provide lay opinion testimony at trial about how his training and experience informed his perceptions of the threat that Frazier posed. *See ADT Sec. Servs., Inc. v. Swenson*, 276 F.R.D. 278, 321 (D. Minn. 2011) ("When a lay witness has particularized knowledge by virtue of [his] experience, [he] may testify—even if the subject matter is specialized or technical—because the testimony is based upon the layperson's personal knowledge rather than on specialized knowledge within the scope of [Federal Rule of Evidence] 702.") (internal quotations omitted). And the "bad acts" evidence Frazier seeks to exclude is clearly admissible. *See Cummings v. Malone*, 995 F.2d 817, 826 (8th Cir. 1993).

Additionally, the parties have submitted competing versions of the Joint Introduction to the Case (ECF No. 91) and will file competing proposed Special Verdict Forms. Regarding the latter, Deputy Mueller's proposed Special Verdict form contains special interrogatories that will enable the jury to make requisite factual findings the Court

may rely upon to make a qualified immunity ruling. *See Ledbetter v. Helmers*, No. 6:21-cv-03125-RK, 2024 WL 8944898, at *1 (W.D. Mo. Feb. 9, 2024).

The parties largely concur on proposed jury instructions and will note all areas of disagreement in a joint filing, following the instructions provided in the Trial Notice and Final Pretrial Order.

## IX.   AUDIO/VISUAL EQUIPMENT

We anticipate using standard evidence presentation cart equipment, including a document camera. For audio recordings, we will bring any necessary converter(s). As is our normal practice, we will set up an appointment with the Calendar Clerk to test all equipment before trial.

Dated:  March 13, 2025                           Respectfully submitted

KEITH ELLISON
Attorney General
State of Minnesota

s/ Jeff Timmerman
JEFF TIMMERMAN
Atty. Reg. No. 0352561
MICHAEL GOODWIN
Atty. Reg. No. 0390244
Assistant Attorneys General

445 Minnesota Street, Suite 1400
St. Paul, MN 55101-2131
(651) 583-7660 (Timmerman)
(651) 757-1456 (Goodwin)
jeffrey.timmerman@ag.state.mn.us
michael.goodwin@ag.state.mn.us

ATTORNEYS FOR DEFENDANT

9